PUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Felton, Judges Alston and McCullough
Argued at Alexandria, Virginia

JAMIE AARON KUHNE

                 OPINION BY
v.  Record No. 0563-11-4     JUDGE STEPHEN R. McCULLOUGH
                  NOVEMBER 6, 2012
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Jane Marum Roush, Judge

Joseph T. Flood (Sheldon & Flood, PLC, on briefs), for appellant.

Aaron J. Campbell, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Jamie Aaron Kuhne challenges his voluntary manslaughter conviction, arguing that certain statements he made to law enforcement should have been excluded as the fruit of an illegal interrogation under Miranda v. Arizona, 384 U.S. 436 (1966), and Missouri v. Seibert, 542 U.S. 600 (2004). We assume, without deciding, that appellant was in custody, and we hold that the statements were admissible under Seibert. We, therefore, affirm the judgment of the trial court.

BACKGROUND

On December 11, 2009, around 7:20 a.m., Kuhne walked into the lobby of a Herndon police station and told the 911 supervisor, Tammy Farley, that he "need[ed] to be arrested for [his] actions." He then began to weep. He handed Farley a handwritten note. Farley informed Sergeant Darcy Nidell of what had just happened. Nidell, in turn, informed Sergeant Dennis Royal. As Royal walked toward the lobby, Farley handed him the note. Royal made copies of the note.

The note states in relevant part:

> Words can not express how sorry I am.  I wish I could take it back.  I did not mean for this to happen[.]  I only wanted her to stop saying she would take my son away from me.  I waited until morning so I could spend one last night with my son . . . .
>
> I put my wife in a bag on the porch so my son would not see what happened when he woke up this morning.  Our address is 718 Tamarack Way . . . in Herndon.
>
> We have no close family members.  If they will take my son I hope he can be raised by either my mother . . . my brother . . . or my sister . . . .
>
> I hope I can die.  I have lost my spouse and am now utterly alone.  I have deprived my son of his mother and father.  I have deprived my wife of her daily joy in contact with our son.

The note was not signed.[1]

Sergeant Michael Berg and Sergeant Nidell arrived in the lobby and introduced themselves to appellant as police officers.  Nidell had not seen the note.  Nidell said, "I understand you are here and you want to talk about a crime" or "turn yourself in for a crime" or words to that effect.  Sergeant Nidell asked appellant where he resided, to determine whether the Herndon police officers had jurisdiction over the case.  Berg asked appellant where his wife was, and he responded "in a bag" and provided an address in the Town of Herndon.  Berg then asked appellant to put his hands on top of his head so he could be patted down for weapons.  Appellant complied, and he was patted down.  Berg also took possession of appellant's wallet, car keys, and some papers.

Berg then escorted appellant out of the lobby, through a door, and into a hallway of the police station.  This door is secured electronically and opens with a fob.  At the end of a hallway that spans 50 to 75 feet, Berg opened a door with a pass key, led appellant into a foyer, and then through a second door that also opens with a pass key and into the interview area.  In the interview

---

[1] Kuhne later signed and dated the note at the request of Sergeant Royal.

room, appellant was asked to remove his shoes and lift his feet to ensure that nothing was hidden in the shoes. Appellant complied, and his shoes were returned to him. Appellant was not handcuffed or touched, aside from the initial pat down and the examination of his feet. Berg was not armed. Appellant was seated in an interview room with an open door. Sergeant Berg placed appellant's wallet, keys, scarf, and jacket on a bench in front of the interview room. The interview room is about 10 feet by 12 feet, with a table and a chair. Berg told appellant something like "we're going to have you sit and we will get somebody back to talk to you." Sergeant Nidell found some paper towels and gave them to appellant as he waited for Sergeant Royal.[2]

Approximately 20 minutes after Sergeants Berg and Nidell first encountered appellant in the lobby, Sergeant Royal arrived in the interview room. Royal first asked some preliminary questions, such as appellant's name, date of birth, and address, and whether he has any medical issues, such as diabetes. Royal next asked appellant if he had written the note. Appellant stated that he had. Royal then issued Miranda warnings to appellant. Appellant also signed a written form waiving his Fifth Amendment rights. Royal proceeded to question appellant. The interview lasted about an hour.

In the interview, appellant explained that he was in the process of separating from his wife, Minghua Zheng. Appellant stated that she pressured him to sign a paper prepared by her lawyer, but he was reluctant to do so without first consulting an attorney. He stated that his wife told him that she would take him to court and charge him with cruelty and that he would never see his son again. He told her, "[H]e's my son, I should be able to see my son." Appellant stated that she

---

[2] At the suppression hearing, Sergeant Nidell testified that after she placed appellant in the interrogation room, and before Sergeant Royal arrived, she asked appellant a few questions. Nidell asked appellant if his wife was still alive. Nidell explained that she had limited information about what had occurred and thought perhaps "there was a way we could get in there to save her." She asked appellant if he was injured. Nidell also asked appellant if he had prior contact with the police, and whether he had left anything in the lobby. These questions and the answers to these questions were not adduced at trial. Because these statements were not introduced into evidence at trial, appellant suffered no conceivable prejudice and we do not discuss these statements further.

laughed at him. Although appellant stated that he does not remember doing this, appellant at some point strangled his wife and put her body in a bag. After killing her, he placed the bag outside. He then wrote the note, initially intending for it to serve as a suicide note.

The videotaped interview is part of the record. It depicts a distraught appellant unburdening himself to Sergeant Royal. Sergeant Royal was gentle and compassionate in his demeanor throughout the interview. At the conclusion of the interview, appellant was arrested and handcuffed.

Police arrived that morning at the address mentioned in the note. They found Zheng's body in a large suitcase on the balcony.

Kuhne was charged with the murder of his wife. Prior to trial, he filed a motion to suppress his statement to the police, arguing that it was obtained in violation of his Miranda rights. At the hearing, Sergeant Royal stated that he was familiar with the deliberate "two-step" interview practice – one in which the police deliberately omit Miranda warnings, obtain incriminating statements, and then prod a suspect to confess anew following Miranda warnings – but he testified that the Herndon Police Department had never used that practice and that he never had used it. Sergeant Nidell stated that she had only recently become familiar with the two-step interrogation procedure. She testified that "[i]t's not anything that we practice and I've never seen it practiced or an interview handled that way." Finally, Sergeant Berg stated that he did not know what the two-step interrogation was until defense counsel explained it to him shortly before trial. Berg stated that to his knowledge, this practice had never been employed in his 24 years with the Herndon Police Department.

The trial court denied the suppression motion, concluding that appellant was not in custody. The court further held that, even if he had been in custody, the actions of the police did not implicate the decision in Missouri v. Seibert, 542 U.S. 600 (2004).

At the conclusion of a jury trial, appellant was convicted of voluntary manslaughter and sentenced to serve seven years in the penitentiary.

ANALYSIS

Appellant contends that the trial court erred in refusing to suppress his statement to the police. First, he argues that he was in custody for Miranda purposes, and, therefore, any statements he made prior to those warnings must be suppressed. Second, he contends that this Court should follow the plurality decision of Seibert authored by Justice Souter, 542 U.S. at 604, and exclude all of appellant's statements to the police, including those that occurred after he was given Miranda warnings. We will assume, without deciding, for purposes of this opinion, that appellant was in custody and, therefore, appellant should have been issued Miranda warnings from the outset of the interrogation. Nevertheless, the concurring opinion by Justice Kennedy in Seibert, which we adopt as constituting the narrowest ground, establishes that the statements appellant made after receiving Miranda warnings were admissible.

On appeal, the burden rests with appellant to show that the denial of his suppression motion constituted reversible error. Harris v. Commonwealth, 276 Va. 689, 695, 668 S.E.2d 141, 145 (2008). The reviewing court is bound by the trial court's findings of historical fact unless plainly wrong or without evidence to support them, and "must give deference to the inferences that may be drawn from those factual findings." Commonwealth v. Hilliard, 270 Va. 42, 49-50, 613 S.E.2d 579, 584 (2005). The trial court's determination that the provision of Miranda warnings cured actual, or, in this instance, assumed, constitutional violations raised by the earlier police interrogation is a legal determination, subject to *de novo* review by this Court. See, e.g., Harris v. Commonwealth, 27 Va. App. 554, 561, 500 S.E.2d 257, 260 (1998); Shears v. Commonwealth, 23 Va. App. 394, 398, 477 S.E.2d 309, 311 (1996).

In 1966, the United States Supreme Court, concerned about "police violence and the 'third degree'" as well as the inherent psychological effects of incommunicado interrogation in a police-dominated atmosphere, fashioned the now famous <u>Miranda</u> warnings that police must issue prior to interrogating suspects who are in custody. 384 U.S. at 445-58, 479. The Court designed these warnings to "assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself." <u>Id.</u> at 439. The Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." <u>Id.</u> at 444.

On occasion, a suspect who is in custody will provide incriminating statements without <u>Miranda</u> warnings and later provide further incriminating details after receiving <u>Miranda</u> warnings. The initial failure to warn may be due to oversight, confusion about whether a suspect is in custody, or a tactical choice by the police not to supply <u>Miranda</u> warnings. Two cases from the United States Supreme Court address the impact of such a situation. First, in <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985), a police officer questioned a suspect at his mother's home about a burglary, without first providing <u>Miranda</u> warnings. The suspect was in custody at that time and, therefore, police should have provided <u>Miranda</u> warnings. The suspect admitted he was present during the burglary. <u>Id.</u> at 301. Police then took the suspect to the police station. About an hour later, police informed him about his <u>Miranda</u> rights and proceeded to question him. He waived his <u>Miranda</u> rights and confessed to his involvement in the crime. <u>Id.</u> at 301-02. The defendant sought to suppress the statement he made at the police station, arguing that the "[unwarned] statement he made in response to questioning at his house 'let the cat out of the bag' and tainted the subsequent confession as 'fruit of the poisonous tree.'" <u>Id.</u> at 302 (citations omitted). The Court rejected this argument, reasoning that "[t]hough <u>Miranda</u> requires that the unwarned

- 6 -

admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." Id. at 309. "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement," the Court concluded, "subsequent administration of Miranda warnings . . . ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." Id. at 314.

The Court revisited the issue in 2004 when it addressed "a new challenge to Miranda": a deliberate "question first" or "two-step" interrogation technique. Seibert, 542 U.S. at 609. Under this technique, police would first seek to elicit a confession without Miranda warnings. If successful, police would then issue Miranda warnings and guide the suspect through a repetition of the statement that was obtained without the benefit of Miranda warnings. Id. at 605-06, 609. Although five Justices concluded that the suspect's second statement could not be admitted as evidence, no single opinion spoke for the Court.

Justice Souter, writing for a plurality that included Justices Stevens, Ginsburg, and Breyer, wrote that "[t]he threshold issue when interrogators question first and warn later is . . . whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as Miranda requires." Id. at 611-12. Justice Souter provided some "relevant facts that bear on whether Miranda warnings delivered midstream could be effective":

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

Id. at 615.

Justice Breyer joined the plurality in full and wrote a separate concurring opinion, in which he expressed his view that "Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." Id. at 617. He expressed his

agreement with Justice Kennedy's opinion "insofar as it is consistent with this approach and makes clear that a good-faith exception applies." Id. at 618.

For his part, Justice Kennedy concurred in the judgment, but on what he termed "narrower" grounds. Id. at 622. Justice Kennedy agreed with the plurality that "[t]he interrogation technique used in this case is designed to circumvent Miranda v. Arizona" and that "statements obtained through the use of this technique are inadmissible." Id. at 618. He concluded, however, that the plurality opinion "cuts too broadly" because it would apply to both intentional and unintentional two-step interrogations. Id. at 622. In his view, unless the police employed "the two-step interrogation technique . . . in a calculated way to undermine the Miranda warning," then "[t]he admissibility of postwarning statements should continue to be governed by the principles of Elstad." Id. at 622.[3]

Finally, Justice O'Connor, joined by Chief Justice Rehnquist and Justices Scalia and Thomas, dissented on the basis that the Elstad framework compelled a different outcome. Justice O'Connor noted her agreement with the Souter plurality that the defendant's statement "cannot be held inadmissible under a 'fruit of the poisonous tree' theory." Id. at 623. Furthermore, in disagreement with Justice Kennedy, she wrote that "the plurality correctly declines to focus its analysis on the subjective intent of the interrogating officer." Id.

---

[3] Justice Kennedy further reasoned that where the interrogating officer deliberately uses the two-step strategy, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." Id. at 622.

Although this Court has not by binding precedent determined the scope of the Seibert holding,[4] a strong majority of federal courts[5] and state courts[6] have adopted Justice Kennedy's concurring opinion as providing the rule of decision. The United States Supreme Court has instructed lower courts that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" Marks v. United States, 430 U.S. 188, 193 (1977) (citation omitted). The plurality and Justice Kennedy agree that where law enforcement officers *deliberately* employ a two-step interrogation to obtain a confession and where separations of time and circumstance and additional curative warnings are absent or do not inform a reasonable person in the suspect's position of his rights, the trial court must suppress the incriminating statement. The Seibert

---

[4] In an unpublished decision, Crosby v. Commonwealth, No. 0847-08-2, 2009 Va. App. LEXIS 514 (2009), we reached the same conclusion as we do here regarding the scope of the Seibert decision.

[5] See United States v. Carter, 489 F.3d 528, 536 (2d Cir. 2007); United States v. Naranjo, 426 F.3d 221, 231-32 (3rd Cir. 2005); United States v. Mashburn, 406 F.3d 303, 309 (4th Cir. 2005); United States v. Courtney, 463 F.3d 333, 338 (5th Cir. 2006); United States v. Torres-Lona, 491 F.3d 750, 758 (8th Cir. 2007); United States v. Williams, 435 F.3d 1148, 1157-58 (9th Cir. 2006); United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006). We recognize that some courts have struggled with whether Justice Kennedy's concurring opinion should provide the rule of decision and, accordingly, have not resolved the question. See United States v. Heron, 564 F.3d 879, 884-85 (7th Cir. 2009); United States v. Carrizales-Toledo, 454 F.3d 1142, 1151 (10th Cir. 2006); see also United States v. Rodriguez-Preciado, 399 F.3d 1118, 1139-41 (9th Cir. 2008) (Berzon, J., dissenting) (urging the United States Court of Appeals for the Ninth Circuit to adopt the Seibert plurality authored by Justice Souter as the law of the Circuit).

[6] See, e.g., State v. Zamora, 202 P.3d 528, 535 n.8 (Ariz. Ct. App. 2009); People v. Camino, 116 Cal. Rptr. 3d 173, 182 (Cal. Ct. App. 2010); Ford v. United States, 931 A.2d 1045, 1051-52 (D.C. 2007); State v. Pitts, 936 So. 2d 1111, 1136 (Fla. Dist. Ct. App. 2006); People v. Lopez, 892 N.E.2d 1047, 1068-69 (Ill. 2008); Jackson v. Commonwealth, 187 S.W.3d 300, 308-09 (Ky. 2006); Callihan v. Commonwealth, 142 S.W.3d 123, 126 (Ky. 2004); Robinson v. State, 19 A.3d 952, 964-65 (Md. 2011); Cooper v. State, 877 A.2d 1095, 1107 (Md. Ct. Spec. App. 2005); State v. Gaw, 285 S.W.3d 318, 323-24 (Mo. 2009); State v. Hughes, 272 S.W.3d 246, 253 (Mo. Ct. App. 2008); Carter v. State, 309 S.W.3d 31, 38 (Tex. Crim. App. 2010); State v. Hickman, 238 P.3d 1240, 1243-44 (Wash. Ct. App. 2010).

plurality would review *all* two-step interrogations under a multi-factor test designed to determine whether the subsequent warnings "could be effective enough to accomplish their object." Seibert, 542 U.S. at 615-16. Justice Kennedy's opinion would apply a form of heightened scrutiny only to those two-step cases in which law enforcement officers deliberately employed a two-step procedure designed to weaken Miranda's protections. 542 U.S. at 621-22. Justice Kennedy's concurring opinion, therefore, represents the narrowest ground and, consequently, constitutes the holding in Seibert.

Justice Kennedy's concurrence also is most consistent with the Elstad decision, which both the plurality and the dissent accepted as valid precedent. In Elstad, the Court noted that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." 470 U.S. at 314. Justice Kennedy's concurrence essentially concludes, consistently with Elstad, that the two-step interrogation technique is one that is "deliberately coercive or improper" and takes such interrogations outside of the general rule articulated in Elstad.

We hold that unless police deliberately employ the "question first" strategy, the admissibility of postwarning statements is governed by Elstad. If the two-step, question first strategy is employed, postwarning statements that are related to the substance of prewarning statements must be excluded unless police take curative measures before the postwarning statements are made. The net effect of Seibert is to carve out an exception to the Elstad framework for cases in which a law enforcement officer employs a deliberate, two-step strategy to obtain a postwarning confession.

The circuit court concluded that this was not a Seibert two-step case, *i.e* one in which the officers deliberately obtained a confession and then prodded the suspect to repeat the confession following Miranda warnings. We first note that this "deliberateness finding is appropriately

reviewed as a factual finding." United States v. Narvaez-Gomez, 489 F.3d 970, 974 (9th Cir. 2007). This Court is "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc) (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996)). Sergeant Royal testified that he did not employ the two-step technique. The evidence establishes that the Herndon Police Department had never used this technique. Moreover, the way Sergeant Royal proceeded differs markedly from the method employed in Seibert. In Seibert, the suspect was questioned for 30 or 40 minutes until she confessed. 542 U.S. at 604-05. The officer in Seibert testified that he deliberately did not provide Miranda warnings at this time. After the suspect confessed, she received a 20-minute coffee and cigarette break. Id. at 605. The officer then turned on a tape recorder, provided Miranda warnings, and resumed questioning. Id. Here, aside from a few preliminary questions, the only question asked before appellant was given Miranda warnings was whether he had authored the note. The trial court's conclusion, that this was not a Seibert two-step case, is fully supported by the record.

The distinct method employed by the police in Seibert was not used here. Therefore, the admissibility of appellant's statements is governed by Elstad. Under that decision, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" with regard to any later, postwarning statement. Elstad, 470 U.S. at 314; Seibert, 542 U.S. at 622 (Kennedy, J., concurring). Instead, "[t]he relevant inquiry is whether, in fact, the second statement also was voluntarily made." Elstad, 470 U.S. at 318.

Examining "the surrounding circumstances and the entire course of police conduct with respect to the suspect," Elstad, 470 U.S. at 318, there can be no serious dispute that the statement appellant provided after he received Miranda warnings was voluntary. The videotape of the

interrogation, which is included in the record and which we have viewed, shows that Sergeant Royal was gentle, solicitous even, in the way he questioned appellant. The surrounding circumstances reveal a guilt stricken man who sought to unburden himself of the crime he committed. Indeed, appellant does not contend that his statement was involuntary.[7]

CONCLUSION

The statements Kuhne made following his <u>Miranda</u> waiver were admissible under <u>Seibert</u> and <u>Elstad</u>. Accordingly, the judgment of the trial court is affirmed.

<u>Affirmed.</u>

---

[7] Again, assuming custody, any error in admitting prewarning statements made by appellant regarding authorship of the note would be harmless beyond a reasonable doubt. <u>See</u> <u>Jenkins v. Commonwealth</u>, 244 Va. 445, 454, 423 S.E.2d 360, 366 (1992). Kuhne tendered the note in person, telling the officer on duty that he needed to be arrested for what he had done. He acknowledged writing the note in the post-<u>Miranda</u> portion of the interview. Most significantly, he admitting killing his wife and stuffing her in a bag.