COURT OF APPEALS OF VIRGINIA

Present: Judges Decker, AtLee and Malveaux
Argued at Richmond, Virginia

NICHOLAS SECRET, S/K/A
 NICHOLAS CHARLES SECRET

v.      Record No. 0853-15-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE RICHARD Y. ATLEE, JR.
FEBRUARY 14, 2017

FROM THE CIRCUIT COURT OF LOUISA COUNTY
Timothy K. Sanner, Judge

Norman A. Thomas (Norman A. Thomas, PLLC, on briefs), for
appellant.

Robert H. Anderson, III, Senior Assistant Attorney General
(Mark R. Herring, Attorney General, on brief), for appellee.


A jury sitting in the Circuit Court of Louisa County convicted appellant Nicholas Charles

Secret of one count of arson and nine counts of attempted first-degree murder. On appeal, Secret

assigns four errors. Additionally, a panel of this Court directed the parties to brief a fifth issue

concerning certain procedural irregularities. For the reasons that follow, we affirm Secret's

convictions.

I. BACKGROUND

"On appeal of criminal convictions, we view the facts in the light most favorable to

the Commonwealth, and draw all reasonable inferences from those facts." Payne v.

Commonwealth, 65 Va. App. 194, 198, 776 S.E.2d 442, 444 (2015).[1] So viewed, the evidence

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The exception in this case is the manner in which we view the facts as they relate to
Secret's assignment of error regarding the circuit court's refusal of his proffered jury instruction.

showed that in early September 2013, Secret began camping at the Acorn Community ("Acorn") in Louisa County. A witness at trial described Acorn as an "intentional community" comprising "about thirty (30) people" who live and work together, sharing the income derived from "cottage industries" such as a "heritage and organic seed business." Acorn permitted non-members to stay on its property in various capacities, including as "guests."[2]

The main building located on Acorn's property was a two-story structure called Heartwood. At Heartwood, there were bedrooms in which members and their guests slept, kitchen facilities for cooking, communal areas for eating and holding meetings, computers, and laundry facilities. Secret was a guest at Acorn by invitation of a member named Paxus Calta. Secret attended some meetings and meals at Heartwood. However, after Secret had been at Acorn through September, Calta notified him that, with the change in seasons, Acorn would not be able to house him for the winter and that he needed to leave by Thanksgiving. (Calta testified that, although Acorn permitted camping, "when it starts getting cold we want to make sure that everybody who is living with us is in a heated building.") Calta also told Secret that some members were concerned about his behavior and that he was making them "uncomfortable." Calta told Secret that if he did not address these behavioral concerns, he would have to leave earlier than Thanksgiving. Secret appeared to respond appropriately to Calta's directives.

---

See infra, Part II.D. In that instance alone, we view the facts in the light most favorable to Secret. See Payne, 65 Va. App. at 198, 776 S.E.2d at 444 (observing that in such instances, an appellate court "view[s] the facts relevant to the determination of that issue in the light most favorable to [the defendant]" (quoting Miller v. Commonwealth, 64 Va. App. 527, 547, 769 S.E.2d 706, 716 (2015) (alterations in original))).

[2] "Guest" is a term of art at Acorn, used as both a noun and a verb. One member of Acorn described the concept by observing that "[p]eople who are guesting are people who have hosts in the community, and the amount of time that they stay is determined by the host or in some cases by the host and the community."

On October 12, 2013, at 5:00 a.m., Calta was working in a downstairs office in Heartwood when he smelled smoke. Other people were still asleep throughout the building. Seeing a fire burning in the kitchen area, Calta alerted the occupants of the building and called 911. Calta noticed fuel cans in the living room and fuel on floors outside of offices and bedrooms in Heartwood. Some of Heartwood's second-floor occupants were trapped upstairs and forced to jump from the roof to escape the fire. Residents of Acorn, working together using buckets of water, succeeded in extinguishing the fire before the fire department arrived. Although no one was killed or suffered serious injury, some who escaped the blaze had bruises and scratches. Expert testimony at trial established that the start of the fire was "inconsistent with an accident."

After putting the fire out, the residents of Acorn conducted a head count. Secret was the only person known to be staying on Acorn property who was missing. Peter Lazear, a Special Agent with the Virginia State Police and a member of the "arson/bomb unit," went to Acorn to investigate the cause of the fire and to gather evidence. Around 5:00 p.m., Special Agent Lazear completed his work at Acorn and began driving back to Richmond to deposit the evidence he had gathered. Meanwhile, Secret, who by this time was a suspect in the arson as he was the only person unaccounted for following the fire, returned to Acorn.

Christopher Snyder, a deputy with the Louisa County Sheriff's Office, was dispatched to Acorn after Secret's return. When Deputy Snyder arrived at Acorn, Secret was outside, sitting in a chair in the rain, with a semi-circle of angry Acorn residents around him. Deputy Snyder advised Secret that someone from the State Police wanted to talk to him and was on the way. Thereafter, Deputy Snyder placed Secret in "investigative detention" and handcuffed him. Secret was cold and wet, and Deputy Snyder offered him a cigarette and otherwise tried to make him comfortable until the arrival of the State Police. While this was going on, Louisa County

dispatch notified Delmas Roberts, Jr., a Special Agent with the Virginia State Police, who had been searching for Secret, that Secret was back at Acorn with Deputy Snyder. As Special Agent Roberts responded to Acorn, he called Special Agent Lazear. Special Agent Roberts testified: "I called Special Agent Lazear to let him know that Mr. Secret was back at the scene and that I was responding back." Special Agent Lazear testified that after hearing this, he "finished processing the evidence at [the] Richmond facility and then . . . started responding back to Louisa County." Special Agent Lazear testified further:

> Agent Roberts contacted me again to ask if I would be interested in speaking to Mr. Secret, and, of course, I said, yes, and he asked if I would like to speak to him there at the scene at Acorn Community or if I would like to speak with him at the sheriff's office. . . . My preference to Agent Roberts was that I would prefer to speak with him at the sheriff's office if Mr. Secret was willing to go there of his own accord.[3]

When Special Agent Roberts arrived at Acorn, he instructed Deputy Snyder to remove the handcuffs from Secret. Special Agent Roberts "asked [Secret] if it would be okay if we transported him to the sheriff's office, that he wasn't under arrest, but the sheriff's office would be a warm, dry place away from here, you know, where we could talk and he agreed. He said that would be fine." Deputy Snyder agreed to transport Secret, since Deputy Snyder's vehicle was equipped with a "cage." However, Louisa County Sheriff's Office departmental policy mandated that anyone transported by a deputy be handcuffed. Secret consented to being

---

[3] Asked at trial why he preferred to speak with Secret at the sheriff's office, Special Agent Lazear responded:

> At the Acorn Community it was an ugly day. It was very nasty, it was rainy, the temperature was dropping, and the sun was going down so it was getting dark, and then I also knew there were a lot of community members at the Acorn Community and they all had exhibited a lot of emotions throughout the day and I know they were anxious to speak with Mr. Secret as well, so I just felt like if we were able to speak at the sheriff's office, it would be a more private environment for us to have a conversation.

handcuffed, and remained so restrained during the trip to the sheriff's office, which took approximately fifteen minutes. Later, Special Agent Roberts called Special Agent Lazear again:

> I told him that I spoke with—I spoke with Mr. Secret and he acknowledged that it was okay to go—he gave consent to go to the sheriff's office, so he was under the impression that we were going to transport him to the sheriff's office, which was a closer destination from where he was coming, Special Agent Lazear.

Upon arrival at the sheriff's office, Deputy Snyder took Secret inside through the sally port,[4] past various cells, and ultimately into an interview room. After arrival at the sheriff's office, Secret's handcuffs were removed.

When Special Agent Lazear arrived at the sheriff's office, he "had casual, social conversation with the few people that were there but nothing concerning Mr. Secret or this case." He then proceeded to the interview room and spoke with Secret for over an hour. Initially, he offered Secret no warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). Explaining his decision not to do so, Special Agent Lazear testified:

> It was my understanding at that time that Mr. Secret was at the sheriff's office of his own free will and accord, so I approached that conversation as exactly that, just a conversation with a witness that—the same as I had with many other people that day. I did not feel he was in custody, and I did not feel like he needed to be read his Miranda warnings at that time.

(Underscoring added). Special Agent Lazear was the only person interviewing Secret, and did not threaten him or physically intimidate him. The door remained closed throughout the interview. For the first portion of the interview, lasting approximately forty minutes, Special Agent Lazear simply allowed Secret to speak, offering Secret little direction. Special Agent Lazear described this as "more of a casual conversation" which allowed Secret to speak "about his life and his understanding of the world." Special Agent Lazear explained that he was trying

_____

[4] A sally port is an area of a building containing a secure entrance/exit that police typically use when transporting prisoners in their custody.

to "build a rapport" with Secret. Eventually, Special Agent Lazear asked Secret: "[W]hat about Acorn made you start the fire in the kitchen this morning?" Although Secret did not respond directly at that time, approximately twelve minutes later, Secret confessed to starting the fire, saying, among other things: "I dumped a whole bunch of fuel in there, then threw a thing full of lit matches into some of the fuel." Following this admission, Special Agent Lazear said:

> Well, Nick, what you've admitted to me is, it's pretty serious and so the law says I have to read something to you before we talk any more about it, okay? So I've got a card here that I'm just going to read to you and go over with you and these are called your Miranda warnings.

Special Agent Lazear then read Secret Miranda warnings. Secret indicated his familiarity with Miranda warnings and confirmed both that he understood the rights read to him and that he wished to waive those rights and continue to speak with Special Agent Lazear. Over the course of the next half-hour, Secret admitted that he set the fire in the kitchen at Acorn that morning, using matches and gasoline. He admitted placing other flammable liquids inside of Heartwood. Secret responded affirmatively when Special Agent Lazear asked, referring to Acorn residents: "Did you know they were upstairs?" Other than Calta, Secret did not name any of the eighteen victims listed in the indictments. Secret said that when he was setting the fire, he saw Calta "in the computer room" and walked behind him "trying to be ginger, . . . 'cause I, I had a plan, like, to . . . dump fuel, dump fuel, dump fuel, light, but I didn't really follow through on the last dumping of fuel, probably because [Calta] was in the computer room." He admitted to fleeing after starting the fire. Throughout Special Agent Lazear's questioning, Secret made bizarre statements, including that he believed the people inside of Heartwood were "holograms" whom the fire would not harm and that these people actually asked him to set the fire.[5]

---

[5] At trial, Secret raised neither his sanity at the time of the offense nor his competency to stand trial.

Ultimately, the Commonwealth charged Secret with one count of arson of an occupied dwelling, a felony, in violation of Code § 18.2-77. The Commonwealth also charged Secret with eighteen counts of attempted first-degree murder "in the commission of arson," each of which was a felony, in violation of Code §§ 18.2-26 and 18.2-32. These eighteen charges all corresponded to people sleeping in Heartwood the night before the fire.

Prior to trial, Secret moved to suppress his admissions to Special Agent Lazear, arguing that the process by which he was advised of his Miranda rights only after admitting to setting the fire violated his rights under the both the Constitution of the United States and the Constitution of Virginia. The circuit court heard testimony, and reviewed the audio and video recording of Secret's statements to Special Agent Lazear. The circuit court ultimately made detailed findings of fact concerning the circumstances of Special Agent Lazear's interview of Secret, and ruled that all of Secret's statements prior to the Miranda warnings were inadmissible. The circuit court also ruled, however, that all of Secret's statements after the Miranda warnings would be admissible in Secret's trial.

At trial, at the conclusion of the Commonwealth's case-in-chief, the circuit court struck five of the attempted first-degree murder charges, leaving the arson charge and thirteen first-degree murder charges. Secret presented no evidence. He renewed his motion to strike the remaining charges, which the circuit court denied. Before closing arguments began, the parties discussed jury instructions with the circuit court. Secret proposed a jury instruction, labeled "Jury Instruction 18," that addressed intent. The trial court refused the instruction, because it was "confusing" and because other instructions would convey the same information.

The jury found Secret guilty of arson and guilty of nine of the attempted first-degree murder charges. The jury acquitted him of four of the attempted first-degree murder charges. The jury sentenced Secret to five years in the penitentiary for arson, and to two years in the

- 7 -

penitentiary for each of the nine counts of attempted first-degree murder.  The jury

recommended a total sentence of twenty-three years, a sentence the circuit court ultimately

imposed.  Secret noted his appeal to this Court.

## II. ANALYSIS

Secret assigns the following four errors:

1. The Trial Court Erred in Partially Denying Secret's Motion to Suppress his October 12, 2013 Statement to Special Agent Lazear, because his Post-Miranda Warnings Statement was not Voluntary.

2. This Court should Revisit its Holding in Kuhne v. Commonwealth, 61 Va. App. 79 (2012), and Either Extend or Modify it, or, Reverse its Adoption of the Legal Test of Justice Kennedy's Concurrence in Missouri v. Seibert, 542 U.S. 600 (2004), regarding Statements Resulting from Two-Step Police Interrogations.

3. The Trial Court Erred in Denying Secret's Motions to Strike the Commonwealth's Evidence regarding each Attempted Murder Charge, because the Commonwealth Failed to Prove Secret's Specific Intent to Kill the Individual Alleged Victims.

4. The Trial Court Erred in Refusing Secret's Proffered Instruction 18 on the Intent Necessary to Prove an Attempted Crime.

Additionally, a panel of this Court "direct[ed] the parties to brief" an additional question:

"Whether the transcripts relevant to appellant's request for writ of certiorari and the trial court's

ruling that their omission was clerical error should be deemed properly filed and made part of the

record."

## A. Procedural Issue

As a threshold mater, we address the procedural question propounded to the parties by a

panel of this Court:  may we deem Secret's late-filed transcripts a part of the record, given that

the circuit court ruled that their omission was due to a "clerical error"?  This question arises due

to certain irregularities that arose following Secret's convictions. The circuit court's June 20, 2015 sentencing order directed preparation of a record of the proceedings "including a transcript of the proceedings which will be initially charged to the Commonwealth and will be assessable as costs for the defendant should the appeal be denied." The court reporter filed two volumes of transcripts in the circuit court on August 18, 2015, and Secret thereafter filed a notice of filing of transcripts.[6] On November 4, 2015, Secret's attorney realized that the court reporter had filed incomplete transcripts which omitted significant portions of the proceedings, including the circuit court's rulings on pretrial motions, Secret's motion to strike the Commonwealth's evidence, certain rulings of the circuit court concerning jury instructions, and the Commonwealth's closing arguments to the jury. On November 6, 2015, Secret filed with this Court motions to extend the deadline for filing his petition for appeal, and for certiorari to enlarge the record. By order on November 19, 2015, this Court ruled that "the time to file the petition for appeal herby [sic] is suspended pending further order of this Court."

Pursuant to Rule 5A:8(a), "[t]he transcript of any proceeding is a part of the record when it is filed in the office of the clerk of the trial court within 60 days after entry of the final judgment." Rule 5A:8(b)(4)(ii) also warns: "When the appellant fails to ensure that the record contains transcripts or a written statement of facts necessary to permit resolution of appellate issues, any assignments of error affected by such omission shall not be considered." However, Code § 8.01-428(B) addresses clerical mistakes, and states:

> Clerical mistakes in all judgments or other parts of the record and errors therein arising from oversight or from an inadvertent omission may be corrected by the court at any time on its own initiative or upon the motion of any party and after such notice, as the court may order. During the pendency of an appeal, such mistakes may be corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending such mistakes may be corrected with leave of the appellate court.

---

[6] Secret had filed his notice of appeal on June 2, 2015.

On January 5, 2016, this Court entered an order finding that Secret's appeal had "not yet been 'docketed' in this Court for the purpose of Code § 8.01-428(B) because the petition for appeal has not yet been filed" and remanded the matter to the circuit court "for the limited purpose of determining whether the failure to file the relevant transcripts constituted a clerical mistake subject to correction pursuant to [Code] § 8.01-428(B) and, if so, what action is appropriate."

At a hearing before the circuit court, Secret's attorney proffered that the court reporter had mistakenly believed that "it wasn't customary" to transcribe entire proceedings. The Commonwealth accepted the stipulation as true, as did the circuit court, which found that the "misunderstanding, however it might arise, clearly constitutes a clerical mistake in the [c]ourt's view." The circuit court ordered that the previously-omitted portions of the transcripts (which by that time had been transcribed and filed with the circuit court) "be sent by the clerk to the Court of Appeals forthwith." By order entered January 29, 2016, the circuit court memorialized these rulings, and the additional transcripts were sent to this Court. The Commonwealth endorsed the order "Seen and not objected to."

The Supreme Court addressed a similar situation in Belew v. Commonwealth, 284 Va. 173, 726 S.E.2d 257 (2012). The Court observed that Code § 8.01-428(B)'s use of "the term 'clerical mistake' . . . was sufficiently broad to encompass oversight or inadvertent omission by court reporters." Id. at 178, 726 S.E.2d at 260 (citing Lamb v. Commonwealth, 222 Va. 161, 164-65, 279 S.E.2d 389, 391-92 (1981)). The Court also confirmed that, "for the purposes of the statute, an appeal 'is docketed in the appellate court' when the petition for appeal is received in the appellate court." Id. (citing Lamb, 222 Va. at 165, 279 S.E.2d at 392).

We conduct *de novo* review of a trial court's interpretation of the Code and the Rules of the Supreme Court. Id. at 177, 726 S.E.2d at 259. Pursuant to Belew, we find that the omission of the full transcripts was the result of a clerical mistake "arising from oversight or from an

inadvertent omission." Code § 8.01-428(B). As such, the circuit court was empowered to correct the error. As no petition for appeal had yet been filed in this Court at the time the circuit court conducted its hearing to determine whether the transcripts had been omitted due to a "clerical mistake," the circuit court retained jurisdiction to make its decision on that matter. Therefore, we deem all transcripts in this case properly filed and make them a part of the record.[7]

## B. The Interrogation

In his first and second assignments of error, Secret argues that the circuit court should have suppressed his entire statement to police. He urges this panel to modify existing binding precedent, but argues that even under existing precedent, the police unconstitutionally manipulated him into an unwarned confession.

"In 1966, the United States Supreme Court . . . fashioned the now famous Miranda warnings that police must issue prior to interrogating suspects who are in custody." Kuhne v. Commonwealth, 61 Va. App. 79, 87, 733 S.E.2d 667, 671 (2012). Designed to "assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself," these warnings must precede custodial interrogation, or the statements cannot be used against the suspect in a subsequent criminal proceeding. Id. (quoting Miranda, 384 U.S. at 439).

> On occasion, a suspect who is in custody will provide incriminating statements without Miranda warnings and later provide further incriminating details after receiving Miranda warnings. The initial failure to warn may be due to oversight, confusion about whether a suspect is in custody, or a tactical choice by the police not to supply Miranda warnings.

Id. Such interrogations occur in two "steps." In the first step, police interrogate an unwarned suspect while he is in custody, and the suspect makes an incriminating statement. In the second

---

[7] Both Secret and the Commonwealth take this position in their briefs.

- 11 -

step, police advise the suspect of his <u>Miranda</u> rights, and the suspect makes additional incriminating statements. In both situations, because the suspect made unwarned admissions while subject to custodial interrogation, a court will suppress the suspect's pre-warning statements. The question then becomes how a court treats the suspect's post-warning statements.

In <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985), the Supreme Court held that "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." <u>Kuhne</u>, 61 Va. App. at 88, 733 S.E.2d at 671 (quoting <u>Elstad</u>, 470 U.S. at 309). "'[A]bsent deliberately coercive or improper tactics in obtaining the initial statement,' the Court concluded, 'subsequent administration of <u>Miranda</u> warnings . . . ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.'" <u>Id.</u> (alterations in original) (quoting <u>Elstad</u>, 470 U.S. at 314).

In <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004), the Supreme Court confronted facts involving a police officer trained in the deliberate use of "two-step" interrogations. "Under this technique, police would first seek to elicit a confession without <u>Miranda</u> warnings. If successful, police would then issue <u>Miranda</u> warnings and guide the suspect through a repetition of the statement that was obtained without the benefit of <u>Miranda</u> warnings." <u>Kuhne</u>, 61 Va. App. at 88, 733 S.E.2d at 671. A plurality of four justices in <u>Seibert</u> promulgated a multi-factor test for assessing the effect of such deliberate tactics. Justice Kennedy concurred in the judgment, but wrote separately, offering his own prescription for dealing with deliberate two-step interrogations. Acknowledging the danger of "the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the <u>Miranda</u> warning," Justice Kennedy insisted that "[t]he admissibility of postwarning statements should continue to be governed by the principles of <u>Elstad</u> *unless the deliberate two-step strategy was employed.*" <u>Seibert</u>, 542 U.S. at 622 (emphasis added).

The United States Supreme Court has instructed lower courts interpreting plurality decisions of the Supreme Court that "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Kuhne, 61 Va. App. at 91, 733 S.E.2d at 672-73 (quoting Marks v. United States, 430 U.S. 188, 193 (1977)). Kuhne therefore adopted Justice Kennedy's concurrence.

Secret argues that this Court should extend, modify, or reverse Kuhne's adoption of Justice Kennedy's reasoning. However, the interpanel accord doctrine prevents this panel's reconsideration of Kuhne. "Under that doctrine, a decision from a panel of this Court 'cannot be overruled except by the Court of Appeals sitting *en banc* or by the Virginia Supreme Court.'" Sandoval v. Commonwealth, 64 Va. App. 398, 419, 768 S.E.2d 709, 720 (2015) (quoting Clinchfield Coal Co. v. Reed, 40 Va. App. 69, 73, 577 S.E.2d 538, 540 (2003)). Further,

> we are constrained by our previous decisions and those of the Supreme Court. See Commonwealth v. Burns, 240 Va. 171, 173-74, 395 S.E.2d 456, 457 (1990) (a panel decision of this Court is established precedent and binding under rules of *stare decisis* upon subsequent panels); Moore v. Commonwealth, 14 Va. App. 83, 85, 414 S.E.2d 859, 860 (1992) (panels of the Court of Appeals are bound by Supreme Court precedent).

Bostic v. Commonwealth, 31 Va. App. 632, 635-36, 525 S.E.2d 67, 68 (2000). Thus, we are bound by the holding in Kuhne.

Secret argues that, even under Justice Kennedy's test, adopted in Kuhne, the circuit court should have suppressed his post-warning statement.

> On appeal, the burden rests with appellant to show that the denial of his suppression motion constituted reversible error. Harris v. Commonwealth, 276 Va. 689, 695, 668 S.E.2d 141, 145 (2008). The reviewing court is bound by the trial court's findings of historical fact unless plainly wrong or without evidence to support them, and "must give deference to the inferences that may be drawn from those factual findings." Commonwealth v. Hilliard, 270 Va. 42, 49-50, 613 S.E.2d 579, 584 (2005).

Kuhne, 61 Va. App. at 86, 733 S.E.2d at 670. The determination of whether the officer's actions were deliberate is a factual finding by the trial court that this Court will not disturb on appeal unless plainly wrong or unsupported by the evidence.

The circuit court made specific factual findings. It found the testimony of Deputy Snyder, Special Agent Roberts, and Special Agent Lazear credible. The circuit court correctly identified the key inquiry as "whether Special Agent Lazear purposefully utilized a two-step interrogation technique as proscribed by Seibert." The circuit court concluded that Special Agent Lazear had not deliberately conducted a two-step interrogation, because "Special Agent Lazear believed that [Secret] had agreed to come voluntarily to speak with him at the Louisa County Sheriff's Office." The circuit court also found that Special Agent Lazear "had not been trained in, nor was he familiar with, the two-step interrogation technique."

These factual findings are not plainly wrong, and are supported by the evidence. Secret argues that Special Agent Lazear's decision not to offer Miranda warnings at the outset of the interrogation came about only by Special Agent Lazear's "willful ignorance" and that Special Agent Lazear's unfamiliarity with two-step interrogation does not change the fact that he did, objectively, interrogate Secret in that manner. We disagree with Secret's assertion, and decline to disturb the circuit court's factual finding that Special Agent Lazear did not deliberately employ a two-step interrogation technique.

Following that finding, the circuit court analyzed Secret's interrogation pursuant to Elstad. Under that case, "the admissibility of any subsequent statement . . . [turns] solely on whether it is knowingly and voluntarily made." Elstad, 470 U.S. at 309. "Voluntariness is a question of law, subject to independent appellate review," but "[s]ubsidiary factual questions . . . are entitled to a presumption of correctness." Avent v. Commonwealth, 279 Va. 175, 195, 688 S.E.2d 244, 255 (2010) (quoting Midkiff v. Commonwealth, 250 Va. 262, 268-69, 462 S.E.2d

- 14 -

112, 116 (1995)).  A trial court's determination that a waiver of <u>Miranda</u> rights "was made

knowingly and intelligently is a question of fact that will not be set aside on appeal unless plainly

wrong."  <u>Angel v. Commonwealth</u>, 281 Va. 248, 258, 704 S.E.2d 386, 392 (2011).

The circuit court watched and listened to the recording of Agent Lazear's interrogation of

Secret.  The circuit court then made lengthy findings to support its ruling:

> Again, the [c]ourt considers the totality of the circumstances in
> which the statements were made.  Initially, the [c]ourt finds that
> the circumstances under which the interview took place exhibit no
> element of coercion whatsoever.  By the time the interview had
> begun, [Secret] had been provided with water and with a blanket to
> make him feel more comfortable. . . .   No threats, be they explicit
> or implicit, were ever made to [Secret] . . . throughout the course
> of the interview, nor was there any moment when Special Agent
> Lazear sought to exploit the previously given unwarranted [sic]
> statement. . . .  Special Agent Lazear . . . seemed to have a
> remarkably good understanding of [Secret]'s cosmetic [sic]
> theories.  Having listened to those theories, as well, while they may
> be somewhat bizarre, they also have a certain rationality of them
> which Special Agent Lazear seemed to understand and this
> understanding seemed to be appreciated by [Secret]. . . .
> Immediately before administering the <u>Miranda</u> warnings, Special
> Agent Lazear advised [Secret] he had just admitted something to
> him that was pretty serious and that because of that he was
> required to give [Secret] his <u>Miranda</u> warnings.  From this [Secret]
> could have concluded, perhaps, it might be best for him not to say
> anything further; however, [Secret] indicated he was familiar with
> the <u>Miranda</u> warnings, that he understood those rights, and when
> asked if he wanted to waive them and talk to Special Agent Lazear,
> he said, quote, sure, end quote.

(Underscoring added).  In light of these findings, the circuit court ruled "that the statements

made by [Secret] following the administration of <u>Miranda</u> rights were not the product of

coercion, were knowingly and voluntarily made, and, thus, the motion to suppress any statements

following the administration of the <u>Miranda</u> warnings is denied."  (Underscoring added).  <u>Elstad</u>

held that in situations such as Secret's, where police give <u>Miranda</u> warnings in the middle of a

custodial interrogation, such warnings "ordinarily should suffice to remove the conditions that

precluded admission of the earlier statement."  <u>Elstad</u>, 470 U.S. at 314.  We find this to be just

- 15 -

such an ordinary situation, and agree with the circuit court that the second half of Secret's statement need not have been suppressed.

Although Secret argues at length about his allegedly "altered mental state," the circuit court found that during the interview, when Special Agent Lazear asked Secret if he was intoxicated, Secret "denied being under the influence of either drugs or alcohol, and having observed his appearance and demeanor during the course of the interview, the [c]ourt finds no evidence of impairment." There was no factual finding that Secret was under the influence of drugs or alcohol.[8]

The trial court's findings that Secret knowingly and voluntarily waived his right to remain silent was not plainly wrong. Accordingly, the trial court did not err in denying Secret's motion to suppress his post-warning statements.

### C. Intent to Kill

Secret asserts that the circuit court erred by denying his motions to strike each attempted murder charge because the Commonwealth failed to prove the specific intent to kill each individual victim. "When considering on appeal the sufficiency of the evidence presented below, we 'presume the judgment of the trial court to be correct' and reverse only if the trial court's decision is 'plainly wrong or without evidence to support it.'" Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*) (quoting Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002)). "On appeal, we will consider the evidence in the light most favorable to the Commonwealth, as it prevailed in the trial court." Whitehurst v. Commonwealth, 63 Va. App. 132, 133, 754 S.E.2d 910, 910 (2014).

---

[8] Secret asserts that "[t]he record established that Secret had ingested [a] hallucinogen," then points this Court to the presentence investigation report. We do not agree that the presentence investigation report (dated over six months after the suppression hearing and over three months after the trial) which happens to include Secret's self-serving statements about his drug use at the time of his crimes, "established" any such fact.

"'To sustain a conviction for attempted murder, the evidence must establish both a specific intent to kill the victim and an overt but ineffectual act committed in furtherance of the criminal purpose.' An overt act must go beyond mere preparation to commit the crime." Bottoms v. Commonwealth, 22 Va. App. 378, 382, 470 S.E.2d 153, 155 (1996) (quoting Wynn v. Commonwealth, 5 Va. App. 283, 292, 362 S.E.2d 193, 198 (1987)). "Intent is the purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case." Ridley v. Commonwealth, 219 Va. 834, 836, 252 S.E.2d 313, 314 (1979). Among the circumstances from which intent may be inferred are "a person's conduct and statements." Robertson v. Commonwealth, 31 Va. App. 814, 820, 525 S.E.2d 640, 643 (2000). A jury "may infer that a person intends the immediate, direct, and necessary consequences of his voluntary acts." Moody v. Commonwealth, 28 Va. App. 702, 706-07, 508 S.E.2d 354, 356 (1998); see also Jury Instr. 10. Importantly, when a jury ascertains a defendant's intent, it makes a factual determination which is "accorded great deference on appeal and will not be reversed unless clearly erroneous." Towler v. Commonwealth, 59 Va. App. 284, 297, 718 S.E.2d 463, 470 (2011).

Secret admitted to Special Agent Lazear that he started the fire but now claims that, to support the attempted murder charges, the Commonwealth was required to prove he intended to kill the specific individual named in each indictment. Here, he claims, there was no evidence that he knew that those particular people were in the building when he set the fire. According to Secret, "each alleged victim had to be identified by Secret as an intended target of the purported direct, ineffectual act toward the commission of his or her first-degree murder." We do not agree with Secret's formulation of the law of intent. He cites, among other cases, Thacker v. Commonwealth, 134 Va. 767, 114 S.E. 504 (1922), and Hargrave v. Commonwealth, 214 Va.

436, 201 S.E.2d 597 (1974), arguing that the evidence must show the specific intent to kill the named victim.

In Thacker, the Supreme Court observed:

> To do an act with intent to commit one crime cannot be an attempt
> to commit another crime though it might result in such other crime.
> To set fire to a house and burn a human being who is in it, but not
> to the offender's knowledge, would be murder, though the intent
> was to burn the house only; but to attempt to set fire to the house
> under such circumstances would be an attempt to commit arson
> only and not an attempt to murder.  A man actuated by general
> malevolence may commit murder though there is no actual
> intention to kill; to be guilty of an attempt to murder there must be
> a specific intent to kill.

Thacker, 134 Va. at 770-71, 114 S.E. at 506 (quoting William L. Clark, Jr. & William E. Mikell, Handbook of Criminal Law 148 (3d ed. 1915)).  Here, Secret was aware that Heartwood was filled with people.  The circuit court observed that there was evidence from which

> the jury could find that [Secret] knew that they were in there and
> that by burning up the house and setting the fire in the way he did,
> spreading diesel all over creation, that he was basically making it
> so they would catch on fire and there would be no escape for the
> people that lived above the fire.

The circuit court also pointed to the manner in which the defendant had set the fire and the fact that he had done so in the middle of the night when many people would be asleep as evidence from which the jury could infer his requisite specific intent.  Lastly, the circuit court pointed to the evidence of "some difficulty [that Secret] had with the group" and "some dissatisfaction which came across in his statement to Special Agent Lazear . . . that evidenced frustration and an attempt to eliminate what he referred to as the holograms."  The circuit court stated that it was a reasonable inference that, by this reference, Secret meant "the people within Acorn and the people within Heartwood on the night in question . . . .  He was essentially eliminating the people who reside there."  So, the jury "could infer that the immediate, direct, and necessary

- 18 -

consequence of [Secret starting the fire] . . . would be that the people within the dwelling would have been consumed within the fire . . . ."

The record supports all of these conclusions. It is unnecessary for Secret to announce his intent to kill each individual victim. A jury may infer this. Secret argues that the evidence did not show that Secret knew anyone other than Calta was in Heartwood when he set the fire. A jury may infer such knowledge as well. Secret poured fuel around a building in the early morning hours when people were still sleeping. The evidence showed Secret wanted to eliminate the "holograms," *i.e.*, the people he knew were in the building at the time he started the fire. Further, he purposefully poured gas outside of bedrooms, offices, and the main living area throughout the first floor, making evacuation difficult. Together, this evidence supports the finding that Secret had the specific intent to kill those present in the building.

The Commonwealth was not required to prove Secret intended to kill specific victims by name. The Commonwealth needed only show he intended to kill the people he knew were in the building, whether he knew their identities or not, at the time he set it on fire. The record shows that the trial court's denial of Secret's motion to strike on the issue of intent was not plainly wrong. Accordingly, the trial court did not err.

### D. Proffered Instruction 18

Finally, Secret claims that the circuit court erred by refusing his proffered jury instruction on the "intent necessary to prove an attempted crime." (Capitalization altered). The circuit court refused Jury Instruction 18, which stated: "To do an act with intent to commit one crime cannot be an attempt to commit another crime, though it might result in such other crime." This instruction was a quotation from Thacker. See Thacker, 134 Va. at 770-71, 114 S.E. at 506.

We review a trial court's decision to refuse a jury instruction for abuse of discretion. King v. Commonwealth, 64 Va. App. 580, 586, 770 S.E.2d 214, 217 (2015) (*en banc*).

However, we review *de novo* "whether a jury instruction accurately states the relevant law." Lawlor v. Commonwealth, 285 Va. 187, 228, 738 S.E.2d 847, 870 (2013) (quoting Orthopedic & Sports Physical Therapy Assocs., Inc. v. Summit Grp. Props., LLC, 283 Va. 777, 782, 724 S.E.2d 718, 721 (2012)). In reviewing jury instructions, our "sole responsibility . . . is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." King, 64 Va. App. at 586-87, 770 S.E.2d at 217-18 (quoting Molina v. Commonwealth, 272 Va. 666, 671, 636 S.E.2d 470, 473 (2006)). "When considering whether a trial court abused its discretion by denying a defendant's proffered instruction, 'we view the facts relevant to the determination of that issue in the light most favorable to [the defendant].'" Holloman v. Commonwealth, 65 Va. App. 147, 174, 775 S.E.2d 434, 448 (2015) (alteration in original) (quoting Commonwealth v. Cary, 271 Va. 87, 91, 623 S.E.2d 906, 907 (2006)). Finally, parties are not entitled to redundant instructions covering principles of law already addressed in other instructions. King, 64 Va. App. at 587-88, 770 S.E.2d at 217 (citing Remington v. Commonwealth, 262 Va. 333, 349, 551 S.E.2d 620, 631 (2001)); see also Ambrose v. Commonwealth, 129 Va. 763, 766, 106 S.E. 348, 349 (1921) ("It is not desirable to multiply instructions and is not error to refuse even a correct instruction on a point upon which the jury has already been fully and correctly instructed."). We find that Secret's proffered Jury Instruction 18 was both confusing and duplicative.

Secret claims Jury Instruction 18 was necessary to instruct the jury that it could not infer the specific intent to kill, in support of the attempted murder charges, solely based on the intent to commit arson. The proffered instruction does not clearly state this proposition. As the circuit court found, the instruction was "misleading" because it suggested that a person could not hold

two intents at the same time.[9]  Furthermore, the circuit court granted other instructions that, when read together, serve the same purpose as Secret's proffered instruction.  See Jury Inst. 10 (instructing that jury "may infer that every person intends the natural and probable consequences of his acts"); Jury Instr. 13 (instructing, in part, that "[t]he intent required to be proved in an attempted crime is the specific intent in the person's mind to commit the particular crime for which the attempt is charged"); Jury Instr. 14 (instructing, in part, that "[t]he direct act required to be proved in an attempted crime is an act which shows a present intention to commit the crime"); Jury Instr. 19 (instructing that as one of the elements required to convict Secret of attempted first-degree murder, the Commonwealth must show that Secret "intended to commit the First-degree Murder of the alleged victim").  The instructions clearly stated the Commonwealth's burden to prove the specific intent to kill each victim.  Further, the evidence proved Secret's specific intent to kill each victim.  See supra, Part II.C.  The law was clearly stated, and the instructions covered all issues raised by the case.  Accordingly, the circuit court did not err by refusing Jury Instruction 18.

III. CONCLUSION

For the reasons stated above, we affirm Secret's convictions.

Affirmed.

---

[9] The circuit court observed:  "[T]he problem is sometimes they're simultaneous intents. I mean, that's—that's the problem.  It just seems to rule out that inference."  Later, the circuit court stated:

> I don't know what the jury would do with this proposed instruction
> because I think it's vague and arguably misleading.  It really does
> seem to the [c]ourt's way of thinking that it simply seems to imply
> that there could only be one intent with respect to a set of
> circumstances and that, therefore, is kind of like, well, pick one,
> it's one or the other.