PRESENT: All the Justices

NICHOLAS CHARLES SECRET

                                            OPINION BY
v. Record No. 170540                ELIZABETH A. McCLANAHAN
                                   October 11, 2018

COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

A jury convicted Nicholas Charles Secret of arson of an occupied dwelling and nine counts of attempted first-degree murder. On appeal, Secret contends the trial court erred in denying his motion to suppress his confession. The confession was given after he was informed of his rights, pursuant to *Miranda v. Arizona,* 384 U.S. 436 (1966), and indicated that he waived them. He claims that his post-warning confession was the product of an intentional and coercive two-step interrogation technique like the one proscribed in *Missouri v. Seibert*, 542 U.S. 600 (2004), or was otherwise involuntary under *Oregon v. Elstad*, 470 U.S. 298 (1985). Secret also contends the trial court erred in denying his motions challenging the sufficiency of the Commonwealth's evidence of his specific intent to commit murder. Finding no error, we affirm Secret's convictions.

## I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Hilton v. Commonwealth*, 293 Va. 293, 296 (2017) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381, (2016)).

### A. The Fire and Secret's Connection to the Dwelling

The fire resulting in Secret's arson and attempted first-degree murder convictions occurred in Louisa County at a dwelling known as "Heartwood" utilized by "an intentional

community" of about 30 individuals identified as the "Acorn Community" ("Acorn").[1] Heartwood was the "principal residence" or "main dormitory" at Acorn, having bedrooms both upstairs and downstairs. It was also the location of Acorn's main office, kitchen and dining area.

In early September 2013, Secret met Acorn member Paxus Calta at a community conference with a sister community and accepted Calta's invitation to come to Acorn as a guest. Calta did not specify the duration of Secret's invitation to stay at Acorn. While at Acorn, Secret camped in a tent on the Acorn property, but attended some of the weekly meetings at Heartwood and ate some of his meals there. After a week at Acorn, Secret asked if he could extend his stay as an intern. Calta testified that some of the Acorn members, "including myself, were not yet comfortable with the idea of [Secret] staying on," so they deferred their decision about Secret's extension. According to Acorn member Daniel Cook, Secret "seemed kind of distracted and kind of rough. He didn't really take instruction super well." At the end of September, Calta further explained, the Acorn members "looked at [their] numbers [and] realized [they] weren't going to have bedrooms for [Secret] and some other people [for the approaching winter months] after Thanksgiving, so [Calta] told [Secret] that he was going to have to find someplace else to go just before Thanksgiving." Calta also advised Secret, however, that he was "making members feel uncomfortable [because] his behavior had been somewhat odd and that if his behavior [did not improve] he would have to leave immediately rather than just before Thanksgiving."

Secret continued on as a guest at Acorn for approximately two more weeks, which ended on the day of the fire at Heartwood. Around 5:00 a.m. that morning, Calta, while on a computer

---

[1] As explained at trial by one of the Acorn members, "[t]he people who live and work [at Acorn] share the income that's generated and [their] collective income satisfies all the needs of the people who are there."

in an office on the first floor at Heartwood, smelled smoke and discovered that the kitchen was on fire. Calta and another Acorn member, who had also discovered the fire at about the same time, yelled to the others in the building that it was on fire, after which all of the occupants managed to evacuate without serious injury. At trial, the identities of at least nine individuals who were in Heartwood at the time of the fire were established.[2] Because of the smoke and flames that had spread to the stairway leading to the second floor, four of those individuals were trapped on the second floor and had to escape by climbing out of their bedroom windows onto a porch roof, and then jumping to the ground. Some of those who exited the building from the first floor detected a liquid that appeared to be gasoline or diesel fuel on the floor of the hallway near their bedrooms and the office where Calta had been working. Calta also saw fuel cans in the main living room next to the office and grabbed one of them, which was actually empty, and carried it outside. It was "absolutely" unusual to see fuel cans in the house, he explained, because they were normally stored about 200 meters away in a barn. After the fire was extinguished, everyone that was residing at Acorn was accounted for with the exception of Secret.

Special Agent Peter Lazear, an arson expert with the Virginia State Police ("VSP") who investigated the Heartwood fire, opined at trial that the fire did not start accidentally. Lazear began his investigation at Heartwood on the morning of the fire. In examining the debris from the fire, he discovered the remains of what appeared to be a five-gallon plastic gasoline container. He collected samples of the debris for forensic analysis and they tested positive for gasoline. In the dining room, Lazear found two containers full of diesel fuel and paint thinner,

---

[2] These nine individuals, who accounted for Secret's convictions on the nine counts of attempted first-degree murder, were as follows: Ken Bezilla, Calta, Bonnie Cook, Cassidy Cook, Daniel Cook, Margaret Cook, Jennifer Hare, Clifton Henley and Irena Hollowell.

respectively, which would have accelerated the growth of the fire had it not first been extinguished. He also found a five-gallon gasoline container on the front porch. In addition, Lazear submitted for analysis traces of the liquid from the fuel container that Calta removed from the living room, which was identified as "fuel oil #2, slash, diesel fuel, a heavy petroleum distillate."

Lazear's examination of the stairway revealed that "the fire was beginning to extend across the stairwell and up the stairwell." He there observed the "depositing of soot from very thick, heavy dark smoke that would have encompassed this stairwell and was starting to move into the center of the structure." It was Lazear's expert opinion that a fire that produced such markings would have "engulf[ed]" the entire structure as it continued to burn had it not been extinguished.

### B. Lazear's Interview with Secret and Secret's Confession

Also as part of his investigation on the day of the fire, Lazear interviewed various Acorn members and was informed of Secret's status at Acorn, his odd behavior and his sudden absence. Based on those interviews, Lazear considered Secret a suspect in the investigation by the time Lazear left the Acorn property late that afternoon. After returning to the VSP facility in Richmond, Lazear received a call regarding Secret from VSP Special Agent Del Roberts, who had assisted Lazear with the investigation. Roberts informed Lazear that, according to the Louisa County Sheriff's Department ("LCSD"), Secret had returned to Acorn. Roberts then asked Lazear if he wished to speak with Secret that evening, and, if so, would he like to speak to Secret at Acorn or the Louisa County Sheriff's Office ("Sheriff's Office"). Lazear stated that he did want to speak with Secret and would prefer to do so at the Sheriff's Office "if Mr. Secret was

4

willing to go there of his own accord."[3] While driving back to Louisa County, Lazear received a follow-up call from Roberts informing Lazear that Roberts would be meeting Lazear with Secret at the Sheriff's Office.

After arriving at the Sheriff's Office, Lazear did not discuss Secret's status with anyone as he proceeded to the interview room, where Secret was waiting alone, without restraints of any kind and seated at a table. Lazear subsequently engaged in conversation with Secret for approximately 30 minutes without specifically mentioning the fire. Lazear then asked Secret, "So what about Acorn made you start the fire in the kitchen this morning?" About 12 minutes later, Secret admitted to starting the fire, stating: "I dumped a whole bunch of fuel in there, then threw a thing full of lit matches into some of the fuel." At that point, Lazear read Secret his *Miranda* rights. Secret indicated that he was familiar with those rights and was waiving them, and would continue to speak with Lazear. Lazear continued the interview for about 30 more minutes during which Secret provided detailed inculpatory statements about his actions in setting fire to Heartwood. Secret was then arrested and subsequently indicted for arson and 18 counts of attempted first-degree murder.

### C. Motion to Suppress Secret's Confession

Secret filed a pre-trial motion to suppress both his pre- and post-*Miranda* warning inculpatory statements made to Lazear during the interview at the Sheriff's Office. First, Secret claimed that his unwarned statements were inadmissible because he had in fact been in police

---

[3] As Lazear testified at Secret's suppression hearing, he believed that the Sheriff's Office "would be a more private environment for us to have a conversation," in light of the fact that Secret was in the midst of "a lot of community members at the Acorn Community [who] all had exhibited a lot of emotions throughout the day."

5

custody before Lazear arrived for the interview.[4]  In making this argument, Secret relied on the testimony at the suppression hearing of Roberts and LCSD Deputy Chris Snyder, who were responsible for Secret's temporary detention at Acorn and his transportation to the Sheriff's Office—with both events involving, *inter alia*, periods of placing Secret in handcuffs.  Agreeing with Secret's custody argument and citing *Hasan v. Commonwealth*, 276 Va. 674 (2008),[5] the trial court ruled that Secret's unwarned statements were inadmissible, and that ruling was not appealed by the Commonwealth.

Second, in regard to his post-warning statements, Secret claimed that Lazear elicited those statements by using a deliberate two-step interrogation strategy to circumvent *Miranda*, a tactic proscribed in *Seibert*—consisting of "successive, unwarned and warned phases" that allegedly deprived Secret of the opportunity to knowingly and intelligently waive his *Miranda* rights.  *Seibert*, 542 U.S. at 609.  Alternatively, Secret asserted that his warned statements were

---

[4] Under *Miranda's* now familiar warnings requirement employed as a prophylactic to protect against violations of the Self-Incrimination Clause of the Fifth Amendment, prior to any custodial questioning, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Miranda*, 384 U.S. at 444; *see id.* (explaining that the privilege against self-incrimination is implicated "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning").  "[F]ailure to give [these] prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any [unwarned] statements obtained."  *Seibert*, 542 U.S. at 608 (Souter, J., plurality opinion).  *See Dixon v. Commonwealth*, 270 Va. 34, 39 (2005) (explaining that, before a suspect in police custody may be questioned, the *Miranda* warnings must be given, and a suspect's statements obtained "in violation of this rule generally will be subject to exclusion for most proof purposes in a criminal trial").  *See also Seibert*, 542 U.S. at 620-22 (Kennedy, J., concurring in judgment) (discussing limited exceptions for use at trial of statements obtained in violation of *Miranda* rule); *see generally* Ronald J. Bacigal, Criminal Procedure § 7:10 (2017) (same).

[5] *See Hasan*, 276 Va. at 679 (addressing relevant considerations in determining whether a person is "in custody" under the controlling standard of "a reasonable person in the suspect's situation" (citations omitted)).

inadmissible under *Elstad's* voluntariness standard in light of the totality of the circumstances involved in his interview with Lazear.

During his testimony at the suppression hearing, Lazear explained why he did not initially inform Secret of his *Miranda* rights: "It was my understanding at that time that Mr. Secret was at the [S]heriff's [O]ffice of his own free will and accord, so I approached that conversation as exactly that, just a conversation with a witness that—the same as I had with many other people that day. I did not feel he was in custody, and I did not feel like he needed to be read his *Miranda* warnings at that time." It was when Secret began to provide Lazear incriminating information about the fire, Lazear explained, that he "needed to pause the conversation and advise [Secret] of his *Miranda* rights." Lazaer also denied that he was aware of, or had received training in, a so-called "question first interrogation technique"—like the one proscribed in *Seibert*. *See Seibert*, 542 U.S. at 606.

In addition, as confirmed by the video recording of the interview, Lazear testified that at no point during the interview did Secret state that he wanted the assistance of an attorney, to end their conversation, or to leave the interview room. Lazear further stated that Secret was "lucid" and was responsive to Lazear's questions. Lazear acknowledged that some of Secret's responses could be considered "bizarre," which prompted Lazear to confirm with Secret that he was not under the influence of any alcohol or drugs.

Based on the testimony of Lazear, Roberts and Snyder, all of whom the trial court found to be credible, its review of the video recording of Lazear's interview with Secret, and its analysis of *Seibert* and *Elstad*, the trial court denied that portion of Secret's suppression motion seeking to exclude the admission of his warned statements to Lazear.

7

Regarding Secret's *Seibert*-based admissibility challenge, the trial court found that, pursuant to his communications with Roberts, "Lazear believed that the defendant had agreed to come voluntarily to speak with him at the Louisa County Sheriff's Office." Based on that belief, Lazear "did not need to administer *Miranda* warnings until he felt that the defendant was beginning to incriminate himself." The trial court also credited Lazear's testimony that "he had not been trained in, nor was he familiar with, the two-step interrogation technique" proscribed in *Seibert*. Accordingly, the court explicitly found that Lazear made "no deliberate use" of that technique when interviewing Secret. The court thus determined that there was no *Seibert* violation.

Absent Lazear's deliberate use of a "question-first strategy," the issue was whether, under *Elstad*, Secret's post-warning statements were "knowingly and voluntarily made." For that determination, the trial court "consider[ed] the totality of the circumstances in which the statements were made." In doing so, the court found, *inter alia*, the following:

- "[T]he circumstances under which the interview took place exhibit no element of coercion whatsoever."

- "No threats, be they explicit or implicit, were ever made to the defendant . . . throughout the course of the interview, nor was there any moment when Special Agent Lazear sought to exploit the previously given unwarranted [sic] statement."

- "A good portion of the interview was substantially open-ended in which the defendant could generally discuss his thoughts and feelings."

- "Special Agent Lazear . . . seemed to have a remarkably good understanding of the defendant's [cosmic] theories [and] while they may be somewhat bizarre, they also have a certain rationality of [sic] them which Special Agent Lazear seemed to understand and this understanding seemed to be appreciated by the defendant."

- "The defendant denied being under the influence of either drugs or alcohol, and having observed his appearance and demeanor during the course of the interview, the [c]ourt finds no evidence of impairment."

8

- After being given his *Miranda* warnings, "the defendant could have concluded, perhaps, it might be best for him not to say anything further; however, the defendant indicated he was familiar with the *Miranda* warnings, that he understood those rights, and when asked if he wanted to waive them and talk to Special Agent Lazear, he said, quote, sure, end quote."

Consequently, the trial court concluded, "the statements made by the defendant following the administration of *Miranda* rights were not the product of coercion, were knowingly and voluntarily made, and, thus, the motion to suppress any statements following the administration of the *Miranda* warnings is denied." The court thus admitted into evidence the portion of those statements offered by the Commonwealth at trial as part of its case in chief.

D. Motions to Strike Commonwealth's Evidence of Attempted Murder

Upon the conclusion of the Commonwealth's case in chief, Secret moved to strike the Commonwealth's evidence as to all of the 18 counts of attempted first-degree murder, each of which named a particular individual victim. First, Secret argued that to the extent the evidence did not establish that a particular individual was actually in Heartwood at the time of the fire, the evidence should be struck as to the count naming such individual. The trial court agreed and struck the evidence on five of the counts. In doing so, the court rejected the Commonwealth's argument that proof that an individual regularly resided at Heartwood, without more, was sufficient.

Additionally, Secret argued that the evidence should be struck on all of the remaining counts of attempted murder because the Commonwealth had failed to prove that Secret had the specific intent to kill anyone. Viewing the evidence in the light most favorable to the Commonwealth, Secret argued, the Commonwealth had at most proved his intent to "commit arson only and not an attempt to murder." The trial court disagreed and denied this portion of the motion to strike. Not only was there evidence that Secret started the fire, the court

9

concluded, but there was also evidence from which "the jury could infer that the immediate, direct, and necessary consequence of [the fire]" was that the people whom Secret knew were within the dwelling "would have been consumed within the fire" but for their fortuitous escape. Secret presented no evidence in his own defense but renewed his motion to strike as to the remaining counts of attempted first-degree murder, which the trial court again denied.

## E. Secret's Convictions and Appeal

The jury convicted Secret of arson of an occupied dwelling and attempted first-degree murder on nine of the remaining 13 counts. On a motion to set aside the verdict, Secret again challenged the admissibility of his post-*Miranda* warning inculpatory statements and the sufficiency of the evidence of his specific intent as to each of the attempted murder counts. The trial court denied the motion on both issues and entered a final judgment of conviction in accordance with the jury's verdicts. Secret appealed these rulings to the Court of Appeals of Virginia. Finding no error, a three-judge panel of the Court of Appeals affirmed Secret's convictions in an unpublished opinion. *Secret v. Commonwealth*, Record No. 0853-15-2 (February 14, 2017). We subsequently awarded Secret this appeal on both issues.

## II. ANALYSIS

### A. Admissibility of Secret's Post-*Miranda* Warning Confession

Secret relies on *Seibert* and, alternatively, *Elstad*, to argue, as he did below, that the trial court erred in refusing to suppress his post-*Miranda* warning inculpatory statements. In both *Elstad* and *Seibert*, the United States Supreme Court addressed situations where a suspect, like Secret, while in police custody, made unwarned inculpatory statements in response to police questioning, and then after receiving and waiving *Miranda* rights made further inculpatory statements in response to additional questioning. The issue in each of those cases, as here, was

10

whether the warned statements were voluntary for purposes of admission in the prosecution's case in chief at the defendant's criminal trial.

## 1. *Oregon v. Elstad*

In *Elstad*, a police officer, upon arriving at Elstad's home to arrest him for burglary, questioned him about the burglary without first providing *Miranda* warnings. 470 U.S. at 300-01. The officer, as he later testified, asked Elstad "if he knew a person by the name of Gross [Elstad's neighbor], and he said yes, he did, and also added that he heard that there was a robbery at the Gross house. And at that point I told Mr. Elstad that I felt he was involved in that, and he looked at me and stated, 'Yes, I was there.'" *Id*. at 301. Elstad was subsequently transported to police headquarters where he was advised of his *Miranda* rights for the first time. He then indicated that he understood his rights, wished to speak to the arresting officers, and gave a "full statement," providing an oral and written confession regarding his role in the robbery. *Id*. at 301-302.

An Oregon state trial court, in ruling upon Elstad's motion to suppress these statements in his prosecution for the burglary, excluded his first inculpatory statement made at his home because he had not been advised of his *Miranda* rights. The court admitted into evidence, however, Elstad's written confession based upon the court's findings that it was "given freely, voluntarily and knowingly" after Elstad was advised of and waived his *Miranda* rights. *Id*. at 302. Following his conviction, Elstad appealed to the Oregon Court of Appeals, arguing that the trial court erred in admitting his post-warning written confession. *Id*. at 302-03. The appeals court agreed and reversed the conviction, reasoning that, "[r]egardless of the absence of actual compulsion, the coercive impact of [the earlier unwarned statement] remains, because in a defendant's mind it has sealed his fate." *Id*. at 303. The appeals court concluded that, because of

11

the brief period of time separating Elstad's unwarned and warned statements, the "coercive impact" of the unwarned statement had not "dissipated." *Id*.

After the Oregon Supreme Court denied the State of Oregon's petition for review, the United States Supreme Court granted certiorari "to consider the question whether the Self-Incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." *Id*. The Supreme Court answered that question in the negative, and therefore reversed and remanded the case to the Oregon Court of Appeals. *Id*. at 318. The Supreme Court concluded that "the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver." *Id*.

In reaching this conclusion, the Supreme Court made clear that the exclusion of inculpatory statements based on the police's failure to administer *Miranda* warnings "does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised." *Id*. at 310. Indeed, as the Court explained, the *Miranda* exclusionary rule "sweeps more broadly than the Fifth Amendment itself" because the Fifth Amendment only prohibits the use of compelled testimony by the prosecution in its case in chief. [6] *Id*. at 306-07. As a result, "unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must

---

[6] The Self-Incrimination Clause of the Fifth Amendment ensures that "no person . . .shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

nevertheless be excluded from evidence under *Miranda*. Thus, in the individual case, *Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm."[7] *Id*.

However, once *Miranda* warnings have been administered to a suspect who has given an unwarned but voluntary inculpatory statement in response to non-coercive questioning, the remedial considerations underlying the *Miranda* exclusionary rule are no longer controlling in determining the admissibility of the subsequent warned statement. As the Supreme Court explained in *Elstad*, "[t]his Court has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver." *Id*. at 312. Thus, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id*. at 314. In other words, the *Miranda* warning "conveys the relevant information and thereafter the

---

[7] That is to say, "[t]he prophylactic *Miranda* warnings . . . are not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected. Requiring *Miranda* warnings before custodial interrogation provides practical reinforcement for the Fifth Amendment right." *Elstad*, 470 U.S. at 306 (quoting *New York v. Quarles*, 467 U.S. 649, 654 (1984) (internal citations and quotation marks omitted)); s*ee Miranda*, 384 U.S. at 444 ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.").

13

suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'"[8] *Id*. at 311 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)).

Holding in *Elstad* that the defendant's post-*Miranda* statements were not rendered involuntary by his unwarned statements, the Supreme Court distinguished between "technical" *Miranda* violations and other "actual" violations of the Fifth Amendment's prohibition on compelled self-incrimination. *Id*. at 314, 318.

The Supreme Court thus established in *Elstad* that, while *Miranda* requires that an unwarned yet voluntary admission must be suppressed, "the admissibility of any subsequent [warned] statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id*. at 309. In short, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntar[y]." *Id*. at 318. Accordingly, as with any such inquiry, "the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." *Id*.

### 2. *Missouri v. Seibert*

Nearly two decades later, the Supreme Court decided *Seibert* against the backdrop of the *Elstad* decision. *Seibert* recognized, as explained below, a narrow exception to *Elstad* "applicable only in the infrequent case" where the police have used "a two-step questioning

---

[8] Consistent with this view, the Supreme Court explicitly refused in *Elstad* to give constitutional dimension to "the psychological impact of the suspect's conviction that he has let the cat out of the bag and, in so doing, has sealed his own fate," which the Oregon Court of Appeals identified as "a subtle form of lingering compulsion." *Elstad*, 470 U.S. at 311. The Supreme Court reasoned that the Oregon court's expansive view of Fifth Amendment compulsion "effectively immunizes a suspect who responds to pre-*Miranda* warning questions from the consequences of his subsequent informed waiver of the privilege of remaining silent." *Id*. at 312.

technique based on a *deliberate violation* of *Miranda*." *Seibert*, 542 U.S. at 620-22 (Kennedy, J., concurring in judgment) (emphasis added).[9]

In *Seibert*, after her bedridden son, Jonathan, died in his sleep, Seibert feared charges of neglect. She was present when two of her other sons discussed burning her family's home and incinerating Jonathan's body in order to conceal the circumstances of his death. As part of the plan, Donald, an unrelated mentally ill teenager living with the family, was to be left in the home in order to avoid the appearance that Jonathan had been unattended. The fire was then set, resulting in Donald's death. 542 U.S. at 604.

Seibert was later arrested, but on instructions from Officer Hanrahan, the arresting officer did not give *Miranda* warnings to her. Seibert was taken to an interview room in the police station, where Hanrahan questioned her for 30 to 40 minutes without *Miranda* warnings. *Id*. at 604-05. During that time, Hanrahan squeezed Seibert's arm and repeated "Donald was also to die in his sleep [in the house fire that was set]." *Id*. at 605. Seibert finally confessed that the plan was for Donald to die in the fire. At that point, Hanrahan gave her a 20-minute break, returned and administered *Miranda* warnings, and obtained a signed waiver. He then resumed his questioning, confronting Seibert with a litany of her unwarned inculpatory statements to which she repeated the earlier information. *Id*.

After being charged with first-degree murder for her role in Donald's death, Seibert moved to suppress both her unwarned and warned statements made to Hanrahan.

---

[9] *See, e.g., United States v. Carter*, 489 F.3d 528, 535-36 (2d Cir. 2007) ("*Seibert*, rather than overruling *Elstad*, carved out an exception to *Elstad* for cases in which a *deliberate,* two-step strategy was used by law enforcement to obtain the postwarning confession." (emphasis added)); *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005) (same); *United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir. 2006) (same); *United States v. Street*, 472 F.3d 1298, 1313 (11th Cir. 2006) (same).

> At the suppression hearing, Officer Hanrahan testified that he made a "conscious decision" to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question "until I get the answer that she's already provided once." He acknowledged that Seibert's ultimate statement was "largely a repeat of information . . . obtained" prior to the warning.

*Id*. at 605-606.

A Missouri state trial court excluded Seibert's unwarned statements but admitted her warned statements, and Seibert was convicted of second-degree murder. The Missouri Court of Appeals affirmed, viewing the case as indistinguishable from *Elstad*. *Id*. at 606. In reversing, the Missouri Supreme Court held that "in the circumstances here, where the interrogation was nearly continuous, . . . the second statement, clearly the product of the invalid first statement, should have been suppressed." *Id*. (citation omitted). The court reasoned that "Officer Hanrahan's intentional omission of a *Miranda* warning was intended to deprive Seibert of the opportunity knowingly and intelligently to waive her *Miranda* rights." *Id*. (citation omitted). The court distinguished *Elstad* on the ground that the *Miranda* warnings had not been intentionally withheld in that case. *Id*. (citation omitted).

On appeal to the United States Supreme Court, the Court affirmed the Missouri Supreme Court in a split decision, holding that the interrogation technique used in the case "undermine[d] [Seibert's] *Miranda* warnings," thus rendering her post-warning inculpatory statements inadmissible. *Id*. at 616 (Souter, J., plurality opinion); *id*. at 618 (Kennedy, J., concurring in judgment). Justice Souter, in authoring the plurality opinion, was joined by three other Justices, including Justice Breyer, who also authored a concurring opinion. Justice Kennedy, with his separate concurrence, provided the fifth vote to affirm.

Under the Supreme Court's settled principles of stare decisis, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five

16

Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)); *see also Panetti v. Quarterman*, 551 U.S. 930, 949 (2007) ("When there is no majority opinion, the narrower holding controls."). "Because *Seibert* is a plurality decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law." *United States v. Street*, 472 F.3d 1298, 1313 (11th Cir. 2006) (citing *United States v. Gonzalez-Lauzan*, 437 F.3d 1128, 1136 n.6 (11th Cir. 2006)); *see also United States v. Capers*, 627 F.3d 470, 476 (2d Cir. 2010); *United States v. Kiam*, 432 F.3d 524, 532 (3d Cir. 2006); *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005); *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006); *United States v. Torres-Lona*, 491 F.3d 750, 758 (8th Cir. 2007); *United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir. 2006); *but see United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015) (applying Justice Souter's plurality opinion as controlling).

Justice Kennedy viewed the plurality's approach to the admissibility issue as "cut[ting] too broadly" in calling for an "objective inquiry from the perspective of the suspect" in both intentional and unintentional two-step interrogations, using a multifactor test. *Seibert*, 542 U.S. at 621-22 (Kennedy, J., concurring in judgment). Such an approach would undermine the Court's "balanced and pragmatic approach to enforcement of the *Miranda* warning" established in *Elstad*. *Id*. at 620. Describing circumstances in which it would be "extravagant" to conclude that a deliberate two-step technique had been used, Justice Kennedy explained that "[a]n officer may not realize that a suspect is in custody and warnings are required. The officer may not plan to question the suspect or may be waiting for a more appropriate time. Skilled investigators

17

often interview suspects multiple times, and good police work may involve referring to prior statements to test their veracity or to refresh recollection." *Id*. at 620.

Narrowing his focus upon the "deliberate" circumvention of *Miranda*, *id*. at 620, Justice Kennedy believed that the admissibility of post-warning statements "should continue to be governed by the principles of *Elstad*" except "in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id*. at 622. In his assessment, the police in *Seibert* deliberately withheld the *Miranda* warning "to obscure both the practical and legal significance of the admonition when finally given." *Id*. at 620.

Under Justice Kennedy's subjective-intent based test, in such cases where "an interrogator uses this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." *Id.* at 621. The sufficiency of the curative measures, some of which Justice Kennedy proposed, would depend upon their capacity to "ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning." *Id.* at 622. In *Seibert*, however, no curative measures were taken, "so the postwarning statements [were] inadmissible and the conviction [could not] stand." *Id*.

### 3. Secret's *Seibert*-Based Challenge

In addressing Secret's challenge to the trial court's finding that Special Agent Lazear did not engage in a deliberate two-step interrogation technique proscribed in *Seibert*, we consider as a matter of first impression the appellate standard applicable for review of this finding. We conclude, as the Virginia Court of Appeals has concluded in addressing the same issue, that the

18

*Seibert* "deliberateness finding is appropriately reviewed as a factual finding." *Kuhne v. Commonwealth*, 61 Va. App. 79, 92 (2012) (quoting *United States v. Narvaez-Gomez*, 489 F.3d 970, 974 (9th Cir. 2007)); *see also Mashburn*, 406 F.3d at 309. Accordingly, in reviewing this finding, we will apply "the standard applicable to appellate review of determinations of fact by a trial court," and "that is, whether the finding is 'plainly wrong or without evidence to support [it].'" *DeMille v. Commonwealth*, 283 Va. 316, 323 (2012) (quoting *Commonwealth v. Squire*, 278 Va. 746, 751 (2009)); *see Commonwealth v. Hilliard*, 270 Va. 42, 49-50 (2005). Furthermore, the burden rests with Secret to establish that the denial of his suppression motion was reversible error. *Branham v. Commonwealth*, 283 Va. 273, 279 (2012); *Sidney v. Commonwealth*, 280 Va. 517, 522 (2010); *Harris v. Commonwealth*, 276 Va. 689, 695 (2008).

The trial court's ultimate factual finding that Lazear did not deliberately use an improper two-step interrogation technique when interviewing Secret is neither plainly wrong nor without evidence to support it. At the suppression hearing, the court heard and credited Lazear's explanation as to why he did not believe Secret was in custody when Lazear met with him at the Sheriff's Office for the interview, but instead thought Secret was there "on his own accord" and willing to speak. It was for that reason, the court found, that Lazear understandably did not administer *Miranda* warnings to Secret when the interview began, doing so only later into the interview when Secret began to provide inculpatory information about the fire at Heartwood. The record also supports the court's additional subsidiary finding that at no time during the pre-warning phase of the interview was there any "element of coercion whatsoever." Finally, the court credited Lazear's testimony that he had not been trained in, nor was he familiar with, the two-step interrogation technique.

19

These findings establish precisely one of the above-described scenarios that Justice Kennedy posited in *Seibert* as qualifying for review under *Elstad*—i.e., a police officer, who is unaware that the suspect is "in custody," receives an unwarned and yet non-coerced inculpatory statement during an interview followed by a warned inculpatory statement, without any deliberate attempt on the part of the officer to circumvent *Miranda* with a "question first" interrogation strategy. *See Seibert*, 542 U.S. at 620; *see also United States v. Stewart*, 536 F.3d 714, 721 (7th Cir. 2008) (police officer's subjective belief regarding defendant's custodial status was relevant to evaluation of his reasons for not initially giving *Miranda* warnings).

For these reasons, like the trial court, we reject Secret's central argument that Lazear's conduct falls within *Seibert's* proscription because Lazear allegedly chose "to remain willfully ignorant of the numerous objective, readily discernable facts indicating Secret's in-custody status." (Appellant's Br. 44). Such conduct, Secret asserts, equates with the employment of an intentional and coercive two-step interrogation tactic. Nothing in Justice Kennedy's concurrence in *Seibert* supports such an approach, where he indeed explicitly rejected the adoption of an "objective inquiry." *Seibert*, 542 U.S. at 621. In addition, the assertion that an interrogator unwittingly used some deliberate strategy is a contradiction in terms. Because the trial court's factual finding that Lazear did not employ a deliberate two-step interrogation strategy has ample evidentiary support, that finding is dispositive.

### 4. Secret's *Elstad*-Based Challenge

Next, we consider Secret's alternative argument that the trial court erred in admitting his post-*Miranda* warning statements because they were not knowingly and voluntarily made based upon the *Elstad* totality-of-the-circumstances standard. We disagree.

20

For purposes of a Fifth Amendment self-incrimination challenge, "[v]oluntariness is a question of law, subject to independent appellate review." *Avent v. Commonwealth*, 279 Va. 175, 195 (2010) (quoting *Midkiff v. Commonwealth*, 250 Va. 262, 268-69 (1995)). "Subsidiary factual questions, however, are entitled to a presumption of correctness." *Id*. (quoting *Midkiff*, 250 Va. at 268). *See Miller v. Fenton*, 474 U.S. 104, 112-17 (1985) (addressing standard of review for "voluntariness" of confession and cited by this Court in *Midkiff*); *see also Burket v. Commonwealth*, 248 Va. 596, 611 (1994) (citing *Miller*); *Mueller v. Commonwealth*, 244 Va. 386, 394 (1992) (same); *Williams v. Commonwealth*, 234 Va. 168, 172 (1987) (same); *Gray v. Commonwealth*, 233 Va. 313, 324 (1987) (same). Accordingly, as to those subsidiary factual findings, we will again apply the above-stated standard of review: whether those findings are "'plainly wrong or without evidence to support [them].'" *DeMille*, 283 Va. at 323 (quoting *Squire*, 278 Va. at 751).

The test for determining voluntariness is whether the statement was the "product of an essentially free and unconstrained choice by its maker," *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973), or "induced by such duress or coercion that the suspect's 'will has been overborne and his capacity for self-determination critically impaired.'" *United States v. Locklear*, 829 F.2d 1314, 1317 (1987) (quoting *Schneckloth*, 413 U.S. at 225); *see Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (holding that "coercive police activity is a necessary predicate" to finding a confession constitutionally involuntary). In determining whether a defendant's will was overborne by police coercion, "courts look to 'the totality of all the surrounding circumstances,' [*Shneckloth*, 413 U.S.] at 226, including the defendant's background and experience and the conduct of the police, *Correll v. Commonwealth*, 232 Va.

454, 464 (1987)," *Avent*, 279 Va. at 195 (quoting *Midkiff*, 250 Va. at 268)—i.e., the *Elstad* standard.

From our review of the record, we conclude, as did the trial court, that the totality of the evidence establishes that Secret's post-*Miranda* warning inculpatory statements to Lazear were knowingly and voluntarily made. The record more than sufficiently supports the trial court's subsidiary factual findings upon which that conclusion is based. Most significantly, the evidence supports the trial court's finding that at no point in the interview, either before or after administration of the *Miranda* warnings, was there any "element of coercion whatsoever" on the part of Lazear that caused Secret to confess. In short, Secret's statements were "not the product of coercion," the court found. Consistent with this finding, the record also supports the court's related specific findings that Lazear neither explicitly nor implicitly threatened Secret, that Lazear did not seek to exploit Secret's previous unwarned statement, and that the evidence established that Secret was not under the influence of drugs or alcohol, or otherwise impaired.

Thus, there is nothing to suggest that Secret's post-*Miranda* statements were anything but the "product of an essentially free and unconstrained choice" as a constitutional matter, *Schneckloth*, 412 U.S. at 225, Secret's contentions to the contrary notwithstanding. In challenging the voluntariness of his post-warning statements, Secret relies heavily on what he claims was his "altered mental state" at the time of his interview with Lazear, as allegedly evidenced by some of his "bizarre" comments during the interview. Appellant's Br. at 36. As support for this argument, Secret cites *Connelly*, 479 U.S. at 164, for the proposition that an accused's mental condition is relevant to "his susceptibility to police coercion." *Id.* Secret's reliance on *Connelly*, however, is not compelling. The trial court here found that, despite Secret's "bizarre" comments in the course of his interview, Secret was not impaired, received

and understood his *Miranda* rights, waived those rights, and then "knowingly and voluntarily" made his warned inculpatory statements. Those findings are supported by the evidence. There is simply nothing in the record to support the contention that Secret's bizarre comments, in and of themselves, established that he was suffering from some kind of "altered mental state" that negated his statements as an "act of free will" in the context of the Fifth Amendment. *Elstad*, 470 U.S. at 311 (quoting *Wong Sun*, 371 U.S. at 486).[10]

### B. Evidentiary Sufficiency of Secret's Intent to Commit Murder

We now turn to Secret's argument that the evidence was insufficient to sustain his convictions on nine counts of attempted first-degree murder. He contends the trial court erred in denying his motion to strike the evidence of those crimes because the Commonwealth failed to prove he possessed the specific intent to commit them. At most, according to Secret, the Commonwealth proved that he acted from a sense of "general malevolence" in setting fire to

---

[10] We note in this regard that the United States Supreme Court made clear in *Connelly* that "voluntariness," for purposes of Fifth Amendment analysis, "has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Connelly*, 479 U.S. at 170. Therefore, the Court explained, "while mental condition is surely relevant to an individual's susceptibility to police coercion," his "mental condition, by itself and apart from its relation to official coercion" can never "dispose of the inquiry into constitutional 'voluntariness.'" *Id*. at 164, 165. That is because "*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." *Id*. at 170-71 (holding that confession of schizophrenic defendant, who believed he was following the "voice of God" in admitting his crime of murder, was voluntary); *see Elstad*, 470 U.S. at 304-05 (explaining that the Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion").

To be sure, as the Supreme Court reaffirmed in *Elstad*, "[v]oluntary statements 'remain a proper element in law enforcement.' *Miranda* v. *Arizona*, 384 U.S. at 478. 'Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable. . . . Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.' *United States* v. *Washington*, 431 U.S. 181, 187 (1977)." *Elstad*, 470 at 305.

Heartwood, which does "not equate to a specific intent to kill." (Appellant's Br. at 25). We reject Secret's assessment of the evidence and assertion of error.

Familiar appellate principles govern our review of this issue. "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). In such cases, "[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Id*. (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009) (internal quotation marks omitted). "Rather, the relevant question is, upon review of the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (quoting *Dietz v. Commonwealth*, 294 Va. 123, 132 (2017) (internal quotation marks omitted)).

First-degree murder includes, among other things, "murder . . . by any willful, deliberate, and premeditated killing, or in the commission of . . . arson . . . ." *Commonwealth v. Herring*, 288 Va. 59, 77 (2014) (quoting Code § 18.2-32). "In the context of attempted murder, the evidence must show 'specific intent to kill the victim,'" along with an overt act. *Id*. (quoting *Hargrave v. Commonwealth*, 214 Va. 436, 437 (1974)); *see id*. at 78 ("An attempt [is] any overt act done with the intent to commit the crime, and which, except for the interference of some cause preventing the carrying out of the intent, would have resulted in the commission of the crime." (quoting *Howard v. Commonwealth*, 207 Va. 222, 228 (1966))). Whether the intent required for attempted murder exists "is generally a question for the trier of fact." *Nobles v. Commonwealth*, 218 Va. 548, 551 (1977); *see Ingram v. Commonwealth*, 192 Va. 794, 801-02

(1951) (determination of defendant's intent "presents a factual question which lies peculiarly within the province of the jury").

"Intent is the purpose formed in a person's mind and may, like any other fact, be shown by circumstances," *Herring*, 288 Va. at 75 (quoting *Howard*, 207 Va. at 228), including the "words or conduct" of the alleged offender, *id*. (quoting *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013)). Indeed, "[i]ntent may be, and most often is, proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts." *Viney v. Commonwealth*, 269 Va. 296, 301 (2005) (citing *Commonwealth v. Hudson*, 265 Va. 505, 512-14 (2003)). Furthermore, "[i]t is permissible for the fact finder to infer that every person intends the natural, probable consequences of his or her actions." *Commonwealth v. Perkins*, 295 Va. 323, 330 (2018) (quoting *Ellis v. Commonwealth*, 281 Va. 499, 507 (2011)).

Here, we conclude the evidence was sufficient to support the jury's finding that Secret possessed the requisite intent to kill the nine individuals located within Heartwood when Secret started the fire there, based on both direct and circumstantial evidence.

At that time, Secret had been residing in a tent on the Acorn property for six weeks, sharing meals at Heartwood, and attending weekly meetings. He was also told that there was no room for him to reside at Heartwood or one of its other facilities. The jury could thus infer that Secret obviously knew Heartwood served as an Acorn dormitory. Also, Secret was becoming increasingly frustrated with Acorn's members during his stay there, as the trial court noted in ruling on Secret's motion to strike.

It is undisputed that Secret set the fire in the kitchen at Heartwood around 5 a.m. when a number of the residents would presumably be asleep. Moreover, before doing so, Secret admitted, he "put a lot of fuel around," consisting of gasoline and diesel fuel. Not only did he

pour the fuel along the first floor hallway near the bedrooms and the office where Calta was working early that morning, but he also placed two cans of fuel in the dining room, which would have accelerated the fire. Secret also admitted that while "dump[ing]" the fuel, he saw Calta in the office and heard people "walking around." After seeing Calta, Secret explained, "I was trying to [walk] ginger[ly], but at that point I was bookin' it. Like I . . . had a plan, like, to . . . dump fuel, dump fuel, dump fuel, light, but I didn't really follow through on the last dumping of fuel, probably because [Calta] was in the computer room." As Secret subsequently described it, "there was so much fuel everywhere I was like, 'Ah, god!' In seconds, [Calta] was about to start smelling all the fuel. I knew that. I was like, 'I gotta get the f**k outta here quick!'" At that point, Secret grabbed two sets of car keys from the pantry, started the fire, and fled into the woods after trying but failing to start two different automobiles located nearby. Describing his emotions to Lazear, Secret stated that, immediately after setting the fire, he thought to himself: "Jesus! I'm the worst! How could I do . . . what was I f**king thinking?"

Based on this evidence, it was entirely rational for the jury to find that Secret intended to kill the nine individuals located within Heartwood at the time of the fire, as the natural and probable consequence of his actions was that everyone there would be consumed by the fire but for their fortuitous escape.

Secret's reliance on *Thacker v. Commonwealth*, 134 Va. 767 (1922) in support of his argument that he possessed only general malevolence and no specific intent to kill at the time of the fire is misplaced. In analyzing the specific intent requirement for attempted murder, this Court in *Thacker* observed:

> To do an act from general malevolence is not an attempt to commit a crime, because there is no specific intent, though the act according to its consequences may amount to a substantive crime. To do an act with intent to commit one crime cannot be an attempt to commit another crime though it might result in such other

26

crime. To set fire to a house and burn a human being who is in it, *but not to the offender's knowledge*, would be murder, though the intent was to burn the house only; but to attempt to set fire to the house under such circumstances would be an attempt to commit arson only and not an attempt to murder. A man actuated by general malevolence may commit murder though there is no actual intention to kill; to be guilty of an attempt to murder there must be a specific intent to kill.

134 Va. at 770-71 (emphasis added). The evidence here establishes that Secret had full knowledge that Heartwood was undoubtedly occupied by several individuals at the time he set the fire. Thus, the jury as fact-finder, and the trial court in ruling on Secret's motion to set aside the verdict, were wholly justified in rejecting his general malevolence argument in challenging the specific intent element of his attempted first-degree murder charges.

We also reject Secret's related argument that there was insufficient evidence to prove that he possessed the requisite intent as to anyone, other than perhaps Calta, because there was no evidence that he was aware of the specific identity of anyone else within Heartwood at the time of the fire. Such knowledge, however, was not required. That is because "[t]he mental state required for attempted murder is the intent to kill a human being, not a *particular* human being." *People v. Stone*, 205 P.3d 272, 274 (Cal. 2009) (emphasis in original).[11] Thus, it was enough, as the jury reasonably concluded based upon Secret's own admissions, that he was aware that

---

[11] As the court in *Stone* cogently explained:

[A] person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person. One of *Bland*'s kill zone examples [in *People v. Bland*, 48 P.3d 1107, 1118 (2002)] involved a bomber who places a bomb on a commercial airplane intending to kill a primary target but ensuring the death of all passengers. We explained that the bomber could be convicted of the attempted murder of all the passengers. But a terrorist who simply wants to kill as many people as possible, and does not know or care who the victims will be, can be just as guilty of attempted murder.

*Stone*, 205 P.3d at 278 (internal citation omitted).

Heartwood was occupied by Calta and others at the time he started the fire; and that the natural and probable consequence of his actions was that all of them—whomever they happened to be—would be killed by the fire. Accordingly, it was rational for the jury to have found Secret guilty of attempted first-degree murder as to each of the nine individuals that the Commonwealth proved were located within Heartwood when Secret started the fire.[12]

## III. CONCLUSION

For the foregoing reasons, we conclude that Secret's post-*Miranda* warning inculpatory statements were voluntary, and thus admissible, and that the evidence was sufficient to establish his specific intent to commit attempted first-degree murder when he started the fire at Heartwood. Accordingly, we affirm the judgment of the Court of Appeals upholding his convictions for arson of an occupied dwelling and nine counts of attempted first-degree murder.

*Affirmed*.

---

[12] We also note that, in challenging his attempted first-degree murder convictions, Secret argues extensively about the trial court's following comments made during argument on Secret's motion to strike: "[W]e don't have any evidence before the jury that [Secret] specifically intended to kill any person individually. The only evidence [we] believe[ ] we have is that he basically intended to kill the people who were there" at Heartwood. First, contrary to Secret's contentions, there was nothing inconsistent about this comment. It was an accurate assessment of the evidence, which, as addressed above, satisfied the specific intent element of attempted murder. That is, the evidence sufficiently established that Secret intended to kill all of the individuals located within Heartwood at the time he started the fire, even if he did not know the specific identity of the individuals that were in the facility at that time, other than Calta. Second, as a matter of appellate review, on a sufficiency challenge to a criminal conviction by a jury, the relevant inquiry is not the trial court's comments about the evidence on a motion to strike, but rather a review of the evidence to determine whether any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt.